# UNITED STATES DISTRICT COURT
# EASTERN DISTRICT OF WISCONSIN

---

TERRANCE J. SHAW,

        Plaintiff,

        v.                                     Case No. 04-C-979

WARDEN JUDY P. SMITH
and MATTHEW FRANK,

        Defendants.

---

## DECISION AND ORDER

---

Plaintiff Terrance J. Shaw, who is incarcerated at the Oshkosh Correctional Institution (OCI),

filed this *pro se* civil rights action pursuant to 42 U.S.C. § 1983 and paid the filing fee. The plaintiff

is proceeding on a claim under the Americans with Disabilities Act of 1999, 104 Stat. 337, 42 U.S.C.

§ 12131 *et seq.*, and the Equal Protection Clause of the Fourteenth Amendment to the United States

Constitution based on allegations that he was denied participation in the Youth Awareness Program

at OCI due to his mental impairment. The defendants have filed a motion for summary judgment and

the plaintiff has filed a cross-motion for summary judgment, both of which will be addressed herein.

### SUMMARY JUDGMENT STANDARD OF REVIEW

Summary judgment "shall be rendered forthwith if the pleadings, depositions, answers to

interrogatories, and admissions on file, together with affidavits, if any, show that there is no genuine

issue of material fact and that the moving party is entitled to judgment as a matter of law." Fed. R.

Civ. P. 56(c); *see also Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986); *Celotex Corp. v.*

*Catrett*, 477 U.S. 317, 324 (1986); *McNeal v. Macht*, 763 F. Supp. 1458, 1460-61 (E.D. Wis. 1991). "Material facts" are those facts that, under the applicable substantive law, "might affect the outcome of the suit." *See Anderson*, 477 U.S. at 248. A dispute over "material facts" is "genuine" if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Id.*

The burden of showing the needlessness of trial is upon the movant: that is, the movant must show (1) the absence of a genuine issue of material fact and (2) an entitlement to judgment as a matter of law. However, when the nonmovant is the party with the ultimate burden of proof at trial, that party retains its burden of producing evidence which would support a reasonable jury verdict. *Anderson*, 477 U.S. at 267; *see also Celotex Corp.*, 477 U.S. at 324 ("proper" summary judgment motion may be "opposed by any of the kinds of evidentiary materials listed in Rule 56(c), except the mere pleadings themselves. . ."); Fed. R. Civ. P. 56(e) ("When a summary judgment motion is made and supported as provided in [Rule 56(c)], an adverse party may not rest upon the mere allegations or denials of the adverse party's pleadings, but the adverse party's response, by affidavit or otherwise provided in [Rule 56], must set forth specific facts showing that there is a genuine issue for trial"). "Rule 56(c) mandates the entry of summary judgment, . . . upon motion, against a party who fails to establish the existence of an element essential to that party's case and on which that party will bear the burden of proof at trial." *Celotex Corp.*, 477 U.S. at 322.

In evaluating a motion for summary judgment, the court must draw all inferences in a light most favorable to the nonmoving party. *Johnson v. Pelker*, 891 F.2d 136, 138 (7th Cir. 1989). "However, we are not required to draw every conceivable inference from the record – only those inferences that are reasonable." *Bank Leumi Le-Israel, B.M. v. Lee*, 928 F.2d 232, 236 (7th Cir. 1991) (citation omitted).

The fact that both parties have moved for summary judgment, and thus both parties simultaneously are arguing that there is no genuine issue of fact, does not establish that a trial is unnecessary or empower me to enter judgment as I see fit. *See* 10A Charles Alan Wright et al. § 2720 at 327-28 (3d ed. 1998). The court may grant summary judgment only if one of the moving parties is entitled to judgment as a matter of law on the basis of the material facts not in dispute. *See Mitchell v. McCarty*, 239 F.2d 721, 723 (7th Cir. 1957). Cross motions for summary judgment do not convert a dispute into a question of law if material factual questions are involved and additional evidence may be adduced at trial which would be helpful in the disposition of the case. *See M. Snower & Co. v. United States*, 140 F.2d 367 (7th Cir. 1944). The proper procedure is to assess the merits of each summary judgment motion independently. Each party, as a movant for summary judgment, bears the burden of establishing that no genuine issue of material fact exists and that it is entitled to a judgment as a matter of law. The fact that one party fails to satisfy that burden on its own motion does not automatically indicate that the opposing party has satisfied its burden and must be granted summary judgment on the other motion. *See* 10A Charles Alan Wright et al. § 2720 at 335.

## FACTS

Both parties have filed proposed findings of fact. This section will set forth the defendants' proposed facts followed by the plaintiff's. Many of the facts are undisputed and therefore there is an overlapping of facts between the two proposed findings of fact. However, the two versions of the facts also include separate factual details, and while these additional facts are not always highly material, they provide a helpful overall context to this action.

3

Both parties filed responses to the other party's proposed findings of fact. The disputes from these responses are indicated with a footnote. Finally, along with his response the plaintiff filed a motion for leave to file a belated response to the defendants' proposed findings of fact. This motion will be granted.

**A. Defendants' Proposed Findings of Fact**

Plaintiff Terrance J. Shaw was an inmate at OCI at all times relevant. (Sahar Aff. ¶ 2, Att. A.) The plaintiff is a sex offender. *Id.* Defendant Judy P. Smith is the warden at OCI. (Smith Aff. ¶ 2.) Defendant Matthew Frank is the Secretary of the Wisconsin Department of Corrections (DOC). (Frank Aff. ¶ 2.)

The plaintiff is incarcerated for the crimes of first degree murder and first degree sexual assault. (Sahar Aff. ¶ 2, Att. A.) He is serving a life sentence and 20 years, consecutive. *Id.* The plaintiff has not completed the Sex Offender Treatment Program during his incarceration with the DOC. (Sahar Aff., Att. H.)

The Youth Awareness Program at OCI is intended to make youth aware of the choices they make; it is designed to deter teens from participating in negative behavior that could ultimately lead them to incarceration. (Smith Aff. ¶ 4; Adams Aff. ¶ 4.) The presenters of the program are a mix of professional staff, administrative staff, security staff, and a select group of inmates who have been carefully screened for appropriateness and presentation skills. (Smith Aff. ¶ 5; Adams Aff. ¶ 5.) Inmate participants emphasize positive decision-making. (Smith Aff. ¶ 6; Adams Aff. ¶ 6.) Through frank discussions, inmates help to relate how getting involved with drugs, alcohol, gangs, and crime, is a negative life decision. *Id.* This program involves approximately twelve inmates who are carefully selected for appropriateness to give a verbal presentation about the reasons they are

4

incarcerated and what events led up to their involvement with criminal activity. (Smith Aff. ¶ 7; Adams Aff. ¶ 7.) After this brief presentation, the inmates are placed at a table with one or two youths and are allowed to answer their questions as well as ask the youths questions about what they are doing to help themselves. *Id.*

The Youth Awareness Program began in June of 1998 with the Oshkosh Police Department's summer youth program and involved over 180 young people. (Smith Aff. ¶ 8; Adams Aff. ¶ 8.) OCI has since held programs for several other groups of young people through schools, local social services agencies, and the court system. *Id.* The Youth Awareness Program participation is a privilege, not an essential program, extended to inmates who have demonstrated positive adjustment and motivation for treatment and change. (Smith Aff. ¶ 9; Adams Aff. ¶ 9.) In addition, the Youth Awareness Program serves juvenile clients from the community, some of whom may be at risk for delinquency and may have been victimized by others. (Smith Aff. ¶ 10; Adams Aff. ¶ 10.)

Because participation in the Youth Awareness Program is restricted to inmates with positive adjustment and program compliance, allowing inmates who have not demonstrated these characteristics to participate could undermine motivation for program participation and change. (Smith Aff. ¶ 11; Adams Aff. ¶ 11.) Exposing potentially troubled youth, or youth who are victims, to untreated sex offenders would create a threat to the community at large.[1] (Smith Aff. ¶ 12; Adams

---

[1] The plaintiff disputes this sentence:

> Defendants offer[] no evidence to support this conclusion that a person classified as a sex offender poses any more of a threat to the community at large by being considered to participate in the Youth Awareness Program (YAP) more so than an individual convicted of any other criminal offense. Therefore, this proposed fact is conclusionary. <u>Abioye v. Sundstrand Corp.</u>, 164 F.3d 364, 368 (7th Cir.).

(Pl.'s Resp. to Defs.' Proposed Findings of Fact at 1.)

Aff. ¶ 12.) The decision to allow only those inmates with positive adjustment and program compliance and to disallow sex offenders was reached after lengthy discussions among professional, administrative, and security staff at OCI. (Smith Aff. ¶ 13; Adams Aff. ¶ 13.) It would be counterproductive to allow inmates who are unmotivated to complete essential programs and who have exhibited negative adjustment to incarceration to participate in the Youth Awareness Program. (Smith Aff. ¶ 14; Adams Aff. ¶ 14.)

OCI's community partners requested that children who participate in the Youth Awareness Program not be exposed to sex offenders because of the nature of sex crimes, the frequent exploitation of children by sex offenders, and the limited success in treating sex offenders.[2] (Smith Aff. ¶ 15.) It is OCI practice with defendant Warden Smith's approval that sex offenders will not participate in the Youth Awareness Program regardless of their treatment status. *Id.*

Dr. Adams met with the plaintiff on August 17, 2004. *Id.* During the meeting, she discussed the reasons why he was not going to be allowed to participate in the Youth Awareness Program. *Id.* The plaintiff was not satisfied with Dr. Adams' explanation and filed a formal complaint using the Inmate Complaint Review System. *Id.* When Dr. Adams was contacted by the investigator, Jennifer Delvaux, Dr. Adams told Ms. Delvaux that she had met with the plaintiff and explained that there is no specific policy that states sex offenders cannot be part of the Youth Awareness Program.

---

[2] The plaintiff disputes this sentence:

This is inadmissible hearsay evidence contrary to Rule 801.802, Fed. R. of Evidence. Defendants have failed to present any affidavits or any other direct evidence which support this proposed fact from Defendant's "Partners" requesting that children who participated in YAP not be exposed to sex offenders because of the nature of sex crimes, the frequent exploitation of children by sex offenders, and the limited success in treating sex offenders.

(Pl.'s Resp. to Defs.' Proposed Findings of Fact at 2.)

(Adams Aff. ¶ 16.) However, it is OCI practice with the approval of defendant Warden Smith that sex offenders will not participate in the Youth Awareness Program. *Id.*

The plaintiff filed a complaint with the Inmate Complaint Review System on September 1, 2004, because Dr. Adams failed to respond to his written request for documentation regarding disallowing all sex offenders from participation in the Youth Awareness Program. (Smith Aff. ¶ 17.) Inmate Complaint Examiner Jennifer Delvaux interviewed Dr. Adams regarding the complaint and on September 3, 2004, she recommended to defendant Smith that it be dismissed. (Smith Aff. ¶ 18.) As warden, defendant Smith is the final reviewer at the institution level relating to recommendations of the inmate complaint examiner. (Smith Aff. ¶ 19.) Defendant Smith concurred with Ms. Delvaux and dismissed the complaint. *Id.* The plaintiff appealed to the corrections complaint examiner, Sandra Hautamaki, who recommended to the Secretary's office that the complaint be dismissed. (Smith Aff. ¶ 20.) DOC Deputy Secretary Richard Raemisch dismissed the complaint on September 15, 2004. (Smith Aff. ¶ 20.) True and correct copies of the appeal documents and decisions at each level are attached to defendant Smith's affidavit and made a part of it. (Smith Aff. ¶ 21.)

Defendant Smith learned recently that two sex offenders participated in the Youth Awareness Program in approximately 1998, when the program was in its early stages. (Smith Aff. ¶ 16.) One of these inmates was in treatment when he started the program and the other had no conviction for a sex offense. *Id.* Their participation was without defendant Smith's knowledge and approval and appears to have been a mistake by the program coordinator, Louis DelFrate, who has since left the employment of OCI. *Id.* Since Dr. Adams became involved in coordinating the Youth Awareness Program in 1998, OCI's consistent practice has been to not allow sex offenders to participate in the program. *Id.* Dr. Adams is aware that when the Youth Awareness Program was first introduced at

7

OCI, sex offenders who had completed treatment were allowed. (Adams Aff. ¶ 17.) The practice at OCI is that sex offenders, regardless of their treatment status, are excluded from the program. *Id.* Dr. Adams has no personal knowledge about why OCI deviated from the practice at that time. *Id.*

Although defendant Secretary Frank has general supervisory authority over DOC operations as provided in the Wisconsin Statutes, he does not supervise the day-to-day operations of individual DOC institutions. (Frank Aff. ¶ 4.) He defers to corrections staff at each institution to make day-to-day decisions and to supervise inmates. *Id.* Defendant Secretary Frank does not, in the ordinary course of his duties as the DOC Secretary, direct or mandate all policy decisions, nor does he personally participate in many decisions concerning development of policy or the day-to-day management of inmates in DOC custody. (Frank Aff. ¶ 5.) Defendant Frank has no personal involvement in any act or decision involving the Youth Awareness Program at OCI. (Frank Aff. ¶ 6.) He relies on the staff at OCI to conduct the Youth Awareness Program according to their internal practices. *Id.* Defendant Frank does not know the plaintiff and he has never met the plaintiff. (Frank Aff. ¶ 7.) Defendant Frank does not have knowledge of the plaintiff's involvement or lack of involvement with the Youth Awareness Program. (Frank Aff. ¶ 8.)

**B. Plaintiff's Proposed Findings of Fact**

The plaintiff was confined at OCI at all times relevant to this action. (Shaw Aff. ¶ 1.) In 1982, he was convicted of First Degree Intentional Homicide and First Degree Sexual Assault, and was sentenced to life plus twenty years. (Shaw Aff. ¶ 2.) Upon entry into the Wisconsin Prison System, the plaintiff was required to participate in Sexual Offender Treatment (SOT), to satisfy his program treatment need. (Shaw Aff. ¶ 3.)

8

In 1983, the plaintiff was transferred to the State of Minnesota prison system for almost four years due to overcrowding in Wisconsin prisons. (Shaw Aff. ¶ 4.) While there, the plaintiff took advantage of Minnesota's Rasmussen Business College courses, and did very well in the relevant courses that he took there, getting eight As, two Bs, and one C. *Id.* In 1993, when the plaintiff was eventually transferred to medium security at OCI, he took advantage of the Fox Valley Technical College Horticulture Program, and did very well in the eleven courses he took there, getting ten As and one B. (Shaw Aff. ¶ 5.) In 1997 the plaintiff took a University of Wisconsin-Extension four-credit algebra correspondence course, and in 1999 he took a three-credit accounting correspondence course, and did very well in both courses, getting an A in each course. (Shaw Aff. ¶ 6.) Additionally, in 1995 at OCI, the plaintiff took the two-week Literacy Volunteers of America course and became certified as a tutor. (Shaw Aff. ¶ 7.) He then tutored many other inmates for several years, specializing in "GED Math," assisting many inmates in obtaining their GEDs and HSEDs. *Id.* Over the past twenty-plus years of the plaintiff's incarceration he has also taken and graduated from the three-year RHEMA Bible College of Tulsa, Oklahoma for 90 credits, and did very well in the thirty-two courses, getting twenty-nine As and three Bs. (Shaw Aff. ¶ 8.) After receiving his diploma from the Rhema Bible College, the plaintiff went on to get his Master's Degree in Religious Studies, a Doctorate in Biblical Studies, and a Ph.D in the Philosophy of Religion. *Id.* He was also bestowed with an Honorary Doctorate of Divinity Degree. *Id.* The plaintiff is also an honorably discharged Vietnam veteran with a post traumatic stress disorder diagnosis, and a 20% service connected disability due to his military service of four years. (Shaw Aff. ¶ 9.)

Prior to the plaintiff's 1982 conviction, he had never been charged or convicted of any felony offense. (Shaw Aff. ¶ 10.) He was thirty-three years old. *Id.* Since the plaintiff's incarceration, he

has had only one major conduct report, for enterprising and fraud, of which he still maintains his innocence. (Shaw Aff. ¶ 11.) Before then, he was without any conduct report for over twenty consecutive years of incarceration. *Id.* The plaintiff knows of no other prisoner who has been incarcerated in the custody of the DOC for over twenty-three consecutive years who has received only one major conduct report. (Shaw Aff. ¶ 12.)

Without it being a program need, the plaintiff came forward during his third decade of consecutive incarceration and volunteered to take, and successfully completed, the Domestic Violence Program, and Anger Management Program, and Aggression/Anger Management Program, the Drug Awareness Group Program, and Drug Education/Evaluation Program, and the Long Distance Dads Program, during his confinement at Waupun Correctional Institution during the years 2001, 2002, and 2003. (Shaw Aff. ¶ 13.) Without it being a program need, the plaintiff came forward in 1992, and volunteered to participate in the Victim-Offender Reconciliation Program, while he was housed at Columbia Correctional Institution because he had so much sorrow and empathy in his heart that his crime caused the family of the victim. (Shaw Aff. ¶ 14.) He wrote letters of apology to the victim's husband and children, and also her parents. *Id.*

On December 16, 1997, the plaintiff entered the Sex Offender Treatment Program at OCI, and began treatment on February 2, 1998. (Shaw Aff. ¶ 15.) However, on August 24, 1999, after over eighteen months of treatment, he was terminated against his will from the program. *Id.* On April 12, 2001, the plaintiff was accepted into and began the Sex Offender Treatment at Waupun Correctional Institution with therapists Dr. Wheeler, Dr. Fleck, Dr. Westendorf, and Dr. Ankarlo. (Shaw Aff. ¶ 16.) On May 11, 2003, Dr. Ankarlo entered his Sex Offender Treatment Program Report, where he concluded that the plaintiff had made "Sufficient Progress" in the areas of treatment

to have completed the program. (Shaw Aff. ¶ 17.) However, due to the seriousness of the nature of his crime, any final decision in this regard should also include "physiological measures [a penis lie detector]" of his current sexual deviancy, or an independent evaluation by a psychologist that has not had him in treatment. *Id.* It was further noted that such evaluation or treatment needs could be met at Racine Correctional Institution or at OCI.[3] *Id.* Because such evaluation and/or treatment was unavailable at Waupun Correctional Institution, in February of 2004, the plaintiff was again transferred back to OCI.[4] (Shaw Aff. ¶ 18.)

On August 17, 2004, the plaintiff was evaluated at OCI by Dr. Lori Adams, Psy.D., a psychologist who has not had him in treatment. (Shaw Aff. ¶ 19.) Dr. Adams concluded that because the plaintiff had not completed two Sex Offender Treatment modules at Waupun Correctional Institution referred to by Dr. Ankarlo, i.e., Knowledge of Relapse Prevention and Knowledge of Behavioral Intervention, he was still in need of treatment for those two modules, which could be taken at either Racine Correctional Institution or OCI. *Id.*

By his participation in the Sex Offender Treatment program for two years before he received his Waupun Correctional Institution Sex Offender Treatment Program Report, and participation in the OCI Sex Offender Treatment Program for eighteen months, the plaintiff has well over-satisfied his initial program need to participate in Sex Offender Treatment.[5] (Shaw Aff. ¶ 20.) The Sex

---

[3] The defendants dispute this paragraph because the plaintiff's evidence does not support the phrase "[a penis lie detector]." (Defs.' Resp. to Pl.'s Proposed Findings of Fact at 5.) The defendants also assert that the paragraph is not material.

[4] According to the defendants, this paragraph is disputed but not material, and the plaintiff offers no evidence that this was the reason he was transferred.

[5] The defendants assert that this paragraph is disputed but not material, and that conclusory affidavits and/or testimony should be disregarded.

11

Offender Treatment Program was not deemed an essential program need when he was first evaluated on January 3, 1983, but the program was only added some seven or eight years later, even though there was no new information offered or considered to support the addition, nor had anything changed in the plaintiff's facts of the case at the time of sentencing and conviction or since he had been incarcerated. (Shaw Aff. ¶ 21.) The plaintiff had not received any inmate sexual misconduct ticket during his incarceration after his conviction and sentencing.[6] *Id.*

Nevertheless, on August 25, 2004, the plaintiff wrote a letter to Chris Krueger, the OCI Sex Offender Treatment Program Unit Director in K-Building, and pursuant to Dr. Ankarlo's 2003 recommendation as well as Dr. Lori Adam's August 17, 2004, independent evaluation, the plaintiff requested re-entry into the OCI Sex Offender Treatment Program to finish taking the physiological measure of his current sexual deviancy (the plythismalgraph) and take the last two Sex Offender Treatment modules, i.e., Knowledge of Relapse Prevention and Knowledge of Behavioral Intervention. (Shaw Aff. ¶ 22.) On September 15, 2004, Chris Krueger defied the two doctor's recommendations and rendered her decision to deny the plaintiff's request for re-entry into the program.[7] (Shaw Aff. ¶ 23.) The plaintiff is motivated to take the plythismalgraph and last two recommended modules so that he will have completed the Sex Offender Treatment Program, but he has no authority to overrule Unit Director Chris Krueger's decision to deny his entry into the program.[8] (Shaw Aff. ¶ 24.)

---

[6] The defendants state that this paragraph is disputed but not material, and that conclusory affidavits and/or testimony should be disregarded.

[7] The defendants dispute this paragraph because conclusory affidavits and/or testimony should be disregarded, but they also assert that it is not material.

[8] The defendants assert that this paragraph is disputed but not material, and that they do not know the plaintiff's motivation.

On August 10, 2004, the plaintiff sent a letter to Dr. Lori Adams at OCI, requesting to be considered for participation in OCI's Youth Awareness Program. (Shaw Aff. ¶ 25.) The plaintiff indicated that he felt so much remorse for taking an innocent human life in his crime, then having spent the last twenty-three years in prison so that he could not raise his own son and daughter, who are now grown, he felt he had a lot of hard-earned and heartfelt insight to offer the program, and could possibly give back to society by contributing to save someone else's life as either a perpetrator or a victim of a future crime.[9] *Id.* On August 17, 2004, the plaintiff met with Dr. Adams, at which time she informed the plaintiff that his request would be denied because it was the practice of the institution that no one who has been classified as a sex offender is eligible for consideration. (Shaw Aff. ¶ 26.)

On September 1, 2004, the plaintiff lodged a formal inmate grievance, #OSCI-2004-28187, against Dr. Adams, alleging inter alia, that any such rule, policy, or practice of the institution which bars the plaintiff from being considered for participating in the Youth Awareness Program is unconstitutional.[10] (Shaw Aff. ¶ 27.) On September 3, 2004, the complaint examiner recommended that the complaint be dismissed. (Shaw Aff. ¶ 28.) That recommendation was accepted by defendant Warden Smith, who on September 7, 2004, rendered her decision to dismiss the complaint. *Id.* On September 10, 2004, the plaintiff appealed the dismissal of his complaint to the corrections complaint examiner, alleging the same issues raised in his original complaint. (Shaw Aff. ¶ 29.) On September 14, 2004, the corrections complaint examiner made her recommendation that the appeal be

---

[9] The defendants dispute this paragraph, state that it is not material, and that they do not know the plaintiff's motivation.

[10] The defendants dispute this paragraph because it is not supported by the plaintiff's citation to the record. They also state that it is not material.

13

dismissed. (Shaw Aff. ¶ 30.) On September 15, 2004, the DOC Deputy Secretary Richard Raemisch rendered his decision as the decision of the Secretary of the DOC. (Shaw Aff. ¶ 31.)

All other prisoners who have been convicted of any other crime, including serial murderers, psychopaths, arsonists, or terrorists, would at least be considered for participation in the Youth Awareness Program if they so required.[11] (Shaw Aff. ¶ 32.) There are over seventeen or more crimes under the Wisconsin Statutes which would be classified as a sexual offense, including, but not limited to, first degree sexual assault, second degree sexual assault, third degree sexual assault, fourth degree sexual assault, child enticement, child sexual exploitation, exposing a child to pornographic materials, etc. (Shaw Aff. ¶ 33.) The female victim of the plaintiff's crime was an adult female. (Shaw Aff. ¶ 34.) The plaintiff has no history of any inappropriate sexual conduct either in or out of prison before or after his present conviction.[12] (Shaw Aff. ¶ 35.) For the defendants to conclude that all persons convicted of any sex offense are the same, is irrational and arbitrary, and bears no rational basis to any legitimate penological objective.[13] (Shaw Aff. ¶ 36.)

The plaintiff has received personal information from another prisoner, Richie Dumer, who was convicted of multiple sex offenses, and had a long history of sex offenses. (Shaw Aff. ¶ 37.) Mr. Dumer was considered and selected to participate in the Youth Awareness Program in approximately 1998, with no misconduct of any kind.[14]  *Id.*  The plaintiff was never given an

---

[11] The defendants dispute this paragraph, asserting that the court should not consider evidence without a proper foundation and proof of personal knowledge. The defendants also state that the paragraph is not material.

[12] The defendants dispute this paragraph because conclusory affidavits and/or testimony should be disregarded. They also state that the paragraph is not material.

[13] The defendants dispute this paragraph, asserting that the court should not consider evidence without a proper foundation and proof of personal knowledge. The defendants also state that the paragraph is not material.

[14] The defendants object to this paragraph as hearsay.

14

individualized assessment by the defendants of whether he was qualified to participate in the Youth Awareness Program after he requested to be considered. (Shaw Aff. ¶ 38.)

The plaintiff is suing the defendants in their individual capacities, seeking monetary damages for the violation of his constitution right to equal protection of the law. (Shaw Aff. ¶ 41.) He also seeks prospective relief against the defendants in their official capacities under the ADA in the form of declaratory and injunctive relief. (Shaw Aff. ¶ 42.)

## ANALYSIS

This issue in this case is whether OCI's practice of not allowing prisoners who are sex offenders to participate in the Youth Awareness Program violates the plaintiff's rights under the ADA and the Equal Protection Clause of the Fourteenth Amendment. Two main facts – that the plaintiff is a sex offender and that he was excluded from consideration for participation in the Youth Awareness Program on that basis – are undisputed.

The defendants contend that they are entitled to judgment as a matter of law on the plaintiff's ADA claim because, 1) they cannot be sued for violations of the ADA in their individual capacities; 2) they cannot be sued for damages in their official capacities, because they are entitled to Eleventh Amendment immunity;[15] and 3) the plaintiff is not a "qualified individual with a disability" protected by the ADA. With respect to the defendants' first two arguments, the plaintiff asserts that these arguments are moot because he is not seeking monetary damages from the defendants for violating the ADA and he is not suing the defendants in their official capacities for monetary damages. (Pl.'s Br. in Resp. to Defs. Mot. for Summ. J. and Cross Mot. for Summ. J. at 5.) Accordingly, the only

---

[15] The Supreme Court recently held that Title II of the ADA validly abrogates states' sovereign immunity insofar as it creates a private cause of action for damages against the states for conduct that actually violates the Fourteenth Amendment. *See United States v. Georgia*, 126 S.Ct. 877 (2006).

issue remaining concerning the ADA claim is whether the plaintiff is a "qualified individual with a disability" under the ADA, and the plaintiff contends that he is. The plaintiff argues that because he is classified as a sex offender, he is "regarded as" suffering from a mental impairment and therefore falls under the definition of a qualified individual with a disability as set forth in 42 U.S.C. § 12102(2).

The defendants contend that they are entitled to judgment as a matter of law on the plaintiff's equal protection claim because, 1) they have Eleventh Amendment immunity against damage claims brought against them in their official capacities under 42 U.S.C. § 1983;[16] 2) defendant Frank cannot be held liable in his individual capacity under § 1983 when he had no direct or personal involvement with the alleged deprivation of rights; 3) the plaintiff is not a member of a protected class, the decision to reject his application was discretionary, rational, and reasonably related to penological interests; and 4) defendants Smith and Frank have qualified immunity. The plaintiff argues that he is entitled to summary judgment on his claim that the defendants violated his right to equal protection of the law by arbitrarily denying his request to participate in the Youth Awareness Program. He contends that there are no material facts in dispute and that the defendants' de facto policy barring all prisoners classified as sex offenders from consideration to participate in the Youth Awareness Program violates the plaintiff's right to equal protection of the law. The plaintiff further contends that defendant Smith is not entitled to qualified immunity.

---

[16] As noted, the plaintiff is not suing the defendants in their official capacities for monetary damages and therefore, there is no need to address this argument. In any event, even if he were, such a suit would be barred by the Eleventh Amendment. *See Will v. Mich. Dep't of State Police*, 491 U.S. 58, 71 (1989).

16

**A. ADA Claim**

The purpose of the ADA is "to provide a clear and comprehensive national mandate for the elimination of discrimination against individuals with disabilities." 42 U.S.C. § 12101(b)(1). It prohibits discrimination against the disabled in the areas of employment (Title I); public services, programs and activities (Title II); and public accommodations (Title III). *Tennessee v. Lane*, 541 U.S. 509 (2004). This case involves Title II, which provides:

> Subject to the provisions of this subchapter, no qualified individual with a disability shall, by reason of such disability, be excluded from participation in or be denied the benefits of the services, programs, or activities of a public entity, or be subjected to discrimination.

42 U.S.C. § 12132. A "public entity" includes "any department, agency, special purpose district, or other instrumentality of a State or States or local government." 42 U.S.C. § 12131(1)(B). State prisons fall within this definition. *Penn. Dep't of Corrs. v. Yeskey*, 524 U.S. 206, 210 (1998).

The defendants contend that the plaintiff does not have a disability recognized by the ADA. As such, he is not a "qualified individual with a disability" under the Act and he was not denied access to the Youth Awareness Program based on an ADA-recognized disability. According to the defendants, the plaintiff has no disability whatsoever and therefore cannot be a victim of discrimination due to a disability because "the status of being a 'convicted sex offender' is neither a diagnosis nor a statement indicative of mental capacity; it is purely a reference to *conviction* for a specific crime." (Defs.' Br. in Supp. of Mot. for Summ. J. at 11.) The defendants state that the plaintiff is unable to articulate any limitations to his major life activities resulting from being a convicted sex offender, is unable to produce any record, or show how he is formally regarded as having any kind of impairment that limits his major life activities.

17

In response, the plaintiff acknowledges that he has never been diagnosed as suffering from any "sexual behavior disorder," and he does not base his ADA claim upon that premise. Rather, the plaintiff contends that "it is only his conviction and classification as a sexual offender that 'Regards' him as suffering from some type of mental disorder or illness that makes him a Qualified Individual." (Pl.'s Br. in Resp. to Defs.' Mot. for Summ. and Cross Mot. for Summ. J. at 2.) He explains:

> Plaintiff's Classification alone as a sex offender makes a reasonable person of average intelligence "Regard" him as suffering from a mental illness which substantially limits one or more of his life's activities. The provisions of Title 28 C.F.R., part 35, apply only where the person actually suffers from a sexual behavior disorder, which is a "Subjective" Standard where the actual mental illness does not make the person a "Qualified Individual with a disability."

> In a nut shell, what Plaintiff argues is that the provisions of the A.D.A. are intended to protect an individual against "Prejudice" caused by the stigma of a label or classification that results in a person of reasonable intelligence to Regard that person as suffering from a disability which would substantially limit one or more of his or her life's activities.

*Id.* at 3. The plaintiff states that being classified as a sex offender substantially limits his major life activities in that he is precluded from certain employment opportunities both in and out of prison, his constitutional right to freely travel and to access housing is limited, and his right to be left alone is limited because he is required "to report and register at the police stations as a sex offender, much like members of the Jewish Religion had to register as 'Jews' in Nazi Germany." *Id.* at 4.

In their reply brief, the defendants state that the plaintiff's contention that his classification as a sex offender makes him a qualified individual with a disability under the ADA "is contrary to the letter and spirit of the ADA" and "makes a mockery of the ADA." (Defs.' Combined Reply Br. in Supp. of Mot. for Summ. J. and Br. in Resp. to Pl.'s Cross Mot. for Summ. J. at 2-3.) According to the defendants, the plaintiff's status as a convicted sex offender is a reference to conviction for a

18

specific crime, not a diagnosis nor a statement indicative of mental capacity. The plaintiff filed a reply brief in support of his cross-motion for summary judgment in which he maintains that he is a qualified individual regarded as having a mental disability under the ADA as a matter of law. The plaintiff contends that all of the undisputed facts and evidence show that they do regard the plaintiff as suffering from some kind of mental disorder, however unfounded, because the defendants have (1) made it mandatory that he take and complete a sexual offender treatment program, and (2) conclude that plaintiff's classification as a sex offender renders him 'unable' to adequately perform in the Youth Awareness Program.

A "qualified individual with a disability" is defined as "an individual with a disability who, with or without reasonable modifications to rules, policies, or practices, the removal of architectural, communication, or transportation barriers, or the provision of auxiliary aids and services, meets the essential eligibility requirements for the receipt of services or the participation in programs or activities provided by a public entity." 42 U.S.C. § 12131(2). "Disability" means "a physical or mental impairment[17] that substantially limits one or more of the major life activities of such

---

[17]    (1)(i) The phrase "physical or mental impairment" means –
(A) Any physiological disorder or condition, cosmetic disfigurement, or anatomical loss affecting one or more of the following body systems: Neurological, musculoskeletal, special sense organs, respiratory (including speech organs), cardiovascular, reproductive, digestive, genitourinary, hemic and lymphatic, skin, and endocrine;
    (B) Any mental or psychological disorder such as mental retardation, organic brain syndrome, emotional or mental illness, and specific learning disabilities.
    (ii) The phrase physical or mental impairment includes, but is not limited to, such contagious and noncontagious diseases and conditions as orthopedic, visual, speech and hearing impairments, cerebral palsy, epilepsy, muscular dystrophy, multiple sclerosis, cancer, heart disease, diabetes, mental retardation, emotional illness, specific learning disabilities, HIV disease (whether symptomatic or asymptomatic), tuberculosis, drug addiction, and alcoholism.
    (iii) The phrase physical or mental impairment does not include homosexuality or bisexuality. 28 C.F.R. § 35.104.

19

individual; a record of such an impairment; or being regarded as having such an impairment."[18] 28 C.F.R. § 35.104. "Substantially limits" means "[u]nable to perform a major life activity that the average person in the general population can perform; or [s]ignificantly restricted as to the condition, manner or duration under which an individual can perform a particular major life activity as compared to the condition, manner, or duration under which the average person in the general population can perform that same major life activity." 29 C.F.R. § 1630.2(j). The term disability does not include, "[t]ransvestism, transsexualism, pedophilia, exhibitionism, voyeurism, gender identity disorders not resulting from physical impairments, or other sexual behavior disorders[.]" *Id.*

It is undisputed that it is OCI's practice, with defendant Warden Smith's approval, that sex offenders will not participate in the Youth Awareness Program. This practice applies to all sex offenders, regardless of their treatment status. It is also undisputed that this decision was reached after lengthy discussions among professional, administrative, and security staff. (It was also decided that only inmates with positive adjustment and program compliance would be allowed to participate.) Whether the plaintiff completed Sex Offender Treatment is irrelevant to whether he can participate in the Youth Awareness Program. Moreover, the plaintiff's academic record since his incarceration as well as his volunteer efforts, while impressive, will not help him in getting into the program.

In order to bring a claim under the ADA one must have disability. The plaintiff acknowledges that he does not have a mental or physical impairment as such but rather claims that

---

[18]   (4) The phrase "is regarded as having an impairment" means –
(i) Has a physical or mental impairment that does not substantially limit major life activities but that is treated by a public entity as constituting such a limitation;
(ii) Has a physical or mental impairment that substantially limits major life activities only as a result of the attitudes of others towards such impairment; or
(iii) Has none of the impairments defined in paragraph (1) of this definition but is treated by a public entity as having such an impairment.
28 C.F.R. § 35.104.

20

he is regarded as having such an impairment because of OCI's practice to not allow sexual offenders into the Youth Awareness Program. He argues that he is being treated as having a mental impairment because OCI will not let him, or any other sex offender, in the program.

The plaintiff is a convicted sex offender and this fact may very well cause reasonable people to question him, his status, their safety around him, and his eligibility for participation in programs, for the rest of his life, no matter how many positive things he does. However, this does not mean that the plaintiff qualifies as "disabled" under the ADA. Simply stated, the plaintiff does not have a "disability" under the ADA. Moreover, there is no evidence that the defendants regarded him as having a "disability," i.e., "physical or mental impairment" as those terms are defined under the ADA. Accordingly, Shaw's ADA claim must fail and the defendants' motion for summary judgment on the plaintiff's ADA claim will be granted.

## B. Equal Protection Claim

## 1. Personal Involvement of Defendant Frank

The undisputed facts fail to demonstrate defendant Wisconsin Department of Corrections Secretary Frank's direct, personal involvement, as required by *Gentry v. Duckworth*, 65 F.3d 555, 561 (7th Cir. 1995). (Frank Aff. ¶¶ 4-7.) Nor has the plaintiff provided any facts showing that the alleged violation of his constitutional rights occurred at Frank's direction or with his knowledge and consent. *Id.* "Section 1983 creates a cause of action based on personal liability and predicated upon fault; thus, liability does not attach unless the individual defendant caused or participated in a constitutional deprivation." *Vance v. Peters*, 97 F.3d 987, 991 (7th Cir. 1996). Moreover, the doctrine of *respondeat superior* (supervisory liability) does not apply to actions filed under 42 U.S.C. § 1983. *See Pacelli v. deVito*, 972 F.2d 871, 877 (7th Cir. 1992). Section 1983 does not create

21

collective or vicarious responsibility.  *Id.*  Accordingly, defendant Frank will be dismissed from this action.

**2. Equal Protection Analysis**

  To comply with equal protection, governmental entities are generally required to treat all similarly situated persons in a similar manner.  *City of Cleburne, Tex. v. Cleburne Living Ctr.*, 473 U.S. 432, 439 (1985).  "To establish a prima facie case of discrimination under the equal protection clause, the plaintiff must show that he is a member of a protected class, that he is otherwise similarly situated to members of the unprotected class, and that he was treated differently from members of the unprotected class." *Brown v. Budz*, 398 F.3d 904, 916 (7th Cir. 2005) (quoting *McNabola v. Chi. Transit Auth.*, 10 F.3d 501, 513 (7th Cir.1993)) (internal quotations omitted).

  The Equal Protection Clause requires inmates to be treated equally; however, a prison regulation that treats inmates unequally will be upheld if it is reasonable in light of legitimate penological interests.  *May v. Sheahan*, 226 F.3d 876, 882 (7th Cir. 2000).  Prisoners do not constitute a suspect class entitled to strict scrutiny of regulations or programs affecting them.  *Pryor v. Brennan*, 914 F.2d 921, 923 (7th Cir. 1990).  Where the circumstances do not involve a suspect classification such as race or gender, an inmate who challenges a particular prison practice or regulation must show or indicate that the regulation is not reasonably related to a legitimate governmental concern, or must demonstrate that the challenged regulation or practice is an exaggerated response to those concerns.  *See Turner v. Safley*, 482 U.S. 78 (1987); *Caldwell v. Miller*, 790 F.2d 589 (7th Cir. 1986).

The defendants contend that the plaintiff's equal protection claim must fail because the decision not to enroll him as a volunteer in the Youth Awareness Program was discretionary and rationally related to legitimate penological objectives. The defendants assert:

> [Defendant] Smith, acting within her discretion as a Warden, followed the professional recommendation of a Youth Awareness Program Psychologist not to admit Shaw to the program. Shaw's involvement in the Youth Awareness Program would have been inconsistent with the penological goals of the Department of Corrections. Placing a man who brutally sexually assaulted and murdered a young woman, has a history of disciplinary action, and has not completed needed treatment in a position of influence over the decision-making process of children could have the effect of increasing crime and putting children in danger, rather than deterring crime, ensuring institutional security, and protecting society. Furthermore, the defendants could rationally conclude that a sex offender with a life sentence would not benefit from a program designed to prepare inmates for their return to society.

(Defs.' Br. in Supp. of Mot. for Summ. J. at 20.)

The plaintiff contends that the defendants' de facto blanket policy to exclude all individuals classified as a sex offender from consideration in the program is arbitrary and irrational. The plaintiff attempts to refute the defendants' justifications for stating that it is a rational policy. First, the plaintiff points out that, although he was sentenced to life in prison, he has been eligible for release on discretionary parole since January 15, 1994. Therefore, the defendants' argument that a sex offender with a life sentence would not benefit from a program designed to prepare inmates for their return to society is without merit. Second, with respect to the defendants' argument that allowing sex offenders like the plaintiff to interact with children who may have been victimized in the past could be harmful to the welfare, safety, and stability of these children, the plaintiff asserts that the defendants have put forth no evidence to support this unfounded conclusion that all individuals convicted of any sex offense would pose any more of a threat to the community or stability of children than any other person similarly situated who has been convicted of any other felony. In

23

response to the defendants' third reason, that "Oshkosh Community Partners" requested children who participate in the program not be exposed to sex offenders because of the nature of their crime, the frequent exploitation of children by sex offenders, and the limited success in treating sex offenders, the plaintiff states that what "Community Partners" requested the defendants to do is best addressed to the politicians and is neither a legitimate penological concern nor an objective sufficient to deny the plaintiff his constitutional right to equal protection of the law.

In their reply brief, the defendants reiterate their argument that there is a rational basis for the decision to exclude the plaintiff, and other inmates convicted of sexual assault, from the Youth Awareness Program:

> First, Judy Smith, acting in her discretion as Warden, concluded that a sex offender with a life sentence would not benefit from a program designed to prepare inmates for their return to society. Second, allowing sex offender like Shaw to interact with children who may have been victimized in the past could be harmful to the welfare, safety and stability of these children. The YAP serves juvenile clients from the community, and exposing these youth to sex offenders could be a threat to the community. Finally, Oshkosh Correctional Institution's community partners requested that children who participate in YAP not be exposed to sex offenders because of the nature of sex crimes, the frequent exploitation of children by sex offenders and the limited success in treating sex offenders. (DPFOF 16). While there are other reasons for excluding Shaw from the YAP, these major reasons standing alone are more than sufficient to meet the rational basis standard.

(Defs.' Combined Reply Br. in Supp. of Mot. for Summ. J. and Br. in Resp. to Pl.'s Cross Mot. for Summ. J. at 4.)

In *Stanley v. Litscher*, 213 F.3d 340 (7th Cir. 2000), a Wisconsin prisoner requested permission to participate in a sex offender program. However, his request was denied because of his diagnosis as a psychopath. *Id.* at 342. The prisoner alleged that the denial of his application to participate in the sex offender program violated, among other things, his right to equal protection.

24

*Id.*  The court held that "[a]s a constitution claim, this goes nowhere."  *Id.*  The court assumed

without deciding that psychopathy was a disability and found that "[d]istinctions on the ground of

disability are proper as long as they are rational."  *Id.*  Furthermore, the court reasoned:

> A state rationally could conclude that psychopaths do not benefit from intra-prison
> programs, that they spoil the programs for less aggressive inmates, or both.  What is
> more, admission to the programs cannot be described as a liberty or property interest.
> No fixed set of criteria entitles anyone to admission, and exclusion leaves the prisoner
> with the normal attributes of confinement.

*Id.*

Here, defendant Smith and other prison officials at OCI, after lengthy discussion, decided to

not allow sex offenders to participate in the Youth Awareness Program regardless of their treatment

status.  The program is not a mandatory, essential program.  Rather, it is a privilege extended to

approximately twelve inmates at a time, who are carefully selected and who, after giving a verbal

presentation, are placed at a table with one or two community youth for the purpose of discussion.

The orderly operation of prisons has generally been committed to prison officials, not the

federal courts.  Such matters are within the peculiar expertise of corrections officials and, therefore,

the courts will generally accord great deference to their expert judgment, unless there is substantial

evidence to argue against it.  *See Bell v. Wolfish*, 441 U.S. 520 (1979); s*ee also Woods v. O'Leary*,

890 F.2d 883 (7th Cir. 1989).  An equal protection claim requires proof that the actions complained

about were undertaken for reasons which were wholly unrelated to any legitimate state objective.

*Esmail v. Macrane*, 53 F.3d 176, 180 (7th Cir. 1995). Security, crime deterrence, and prisoner

rehabilitation are all legitimate penological concerns.  *See Al-Alamin v. Gramley*, 926 F.2d 680, 686

(7th Cir. 1991).  The state could rationally conclude that excluding convicted sex offenders from

eligibility for participation in the Youth Awareness Program is related to the legitimate penologial

Case 2:04-cv-00979-WEC   Filed 03/10/06   Page 25 of 26   Document 49

concern of security. Accordingly, the defendants' motion for summary judgment on this equal protection claim will be granted and the plaintiff's cross-motion for summary judgment will be denied.

## ORDER

**NOW THEREFORE IT IS ORDERED** that the defendants' motion for summary judgment (Docket #22) be and hereby is **GRANTED**;

**IT IS FURTHER ORDERED** that the plaintiff's cross-motion for summary judgment (Docket #34) be and hereby is **DENIED**;

**IT IS FURTHER ORDERED** that plaintiff's motion for leave to file belated response (Docket #46) be and hereby is **GRANTED**.

**IT IS FURTHER ORDERED** that the Clerk of Court enter judgment dismissing the plaintiff's claims and this action.

Dated at Milwaukee, Wisconsin this 10th day of March, 2006.

BY THE COURT:


/s/ William E. Callahan, Jr.
WILLIAM E. CALLAHAN, JR.
United States Magistrate Judge

26